No. **10-80074**

RECEIVED
OFFICE OF THE CLERK
U.S. COURT OF APPEALS
PUBLIC INFORMATION UNIT

2010 MAR 25  PM 3: 36

FILED 3/25/10  HC
DOCKETED 3/26/10  HC
DATE    INITIAL

District Court Case No: 2:07-cv-02517 (FCD-GGH), E.D.Cal.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

GENERAL CHARLES E. "CHUCK" YEAGER (RET.),
Plaintiff - Respondent,

v.

AT&T MOBILITY, LLC,
Defendant - Petitioner.

---

## AT&T MOBILITY, LLC'S PETITION FOR PERMISSION TO APPEAL
## 28 U.S.C. § 1292(b)

---

Andrew W. Stroud
Stephen Lau
Margaret Carew Toledo
MENNEMEIER, GLASSMAN & STROUD LLP
980 Ninth Street, Suite 1700
Sacramento, CA 95814
Telephone:  (916) 553-4000
Facsimile:  (916) 553-4011
E-mail: stroud@mgslaw.com


Attorneys for Defendant - Petitioner
AT&T MOBILITY, LLC

No._____

District Court Case No: 2:07-cv-02517 (FCD-GGH), E.D.Cal.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GENERAL CHARLES E. "CHUCK" YEAGER (RET.),
Plaintiff - Respondent,

v.

AT&T MOBILITY, LLC,
Defendant - Petitioner.

---

## AT&T MOBILITY, LLC'S PETITION FOR PERMISSION TO APPEAL
## 28 U.S.C. § 1292(b)

---

Andrew W. Stroud
Stephen Lau
Margaret Carew Toledo
MENNEMEIER, GLASSMAN & STROUD LLP
980 Ninth Street, Suite 1700
Sacramento, CA 95814
Telephone: (916) 553-4000
Facsimile: (916) 553-4011
E-mail: stroud@mgslaw.com


Attorneys for Defendant - Petitioner
AT&T MOBILITY, LLC

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioner AT&T Mobility, LLC ("Petitioner") states that Petitioner is a Delaware limited liability company that is owned by: SBC Long Distance, LLC (50.498%), SBC Alloy Holdings, Inc. (9.437%), AT&T Mobility Corporation (.0000001%), New BellSouth Cingular Holdings, Inc. (6.399%), and BellSouth Mobile (33.65%). No publicly held corporation owns 10% or more of Petitioner's stock.

# TABLE OF CONTENTS

Page

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. AT&T Issues A Press Release Regarding Disaster Preparedness . . . 3

    B. The Press Release Generates Significant News Coverage For The Disaster Preparedness Program . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C. AT&T Moves For Summary Judgment Arguing, Among Other Things, That The Press Release Is Not Commercial Speech . . . . . . . 6

    D. The Parties Stipulate To Vacate The Trial Date And Stay The Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E. The District Court Grants AT&T's Motion For Certification Based Upon The Controlling Issue Regarding Commercial Speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. CONTROLLING QUESTION OF LAW PRESENTED . . . . . . . . . . . . . . 8

IV. SUBSTANTIAL GROUND FOR A DIFFERENCE OF OPINION . . . . . . 9

    A. Whether A Press Release Is Noncommercial Speech Is An Issue Of First Impression In This Circuit. . . . . . . . . . . . . . . . . . . . . . 10

    B. The District Court's Application of *Bolger* Is In Error. . . . . . . . . . 11

    C. The Press Release Does Not Propose A Commercial Transaction . 14

    D. Under The District Court's Analysis, All Press Releases Issued By Businesses Will Be Deemed Commercial Speech . . . . . . . . . . 16

V. AN IMMEDIATE APPEAL WILL MATERIALLY ADVANCE THE LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

*Accenture Global Servs. GMBH v. Guidewire Software, Inc.,*
581 F. Supp. 2d 654 (D. Del. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*American Academy of Pain Mgmt. v. Joseph,*
353 F.3d 1099 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Association of Irritated Residents v. Fred Schakel Dairy,*
634 F. Supp. 2d 1081 (E.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cairns v. Franklin Mint Co.,*
24 F. Supp. 2d 1013 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Cement Antitrust Litig.,*
673 F.2d 1020 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 17

*Citizens United v. Federal Election Comm'n,*
_U.S._, 130 S. Ct. 876 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Commodity Trend Serv. v. Commodity Futures Trading Comm'n,*
149 F. 3d 679 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*CPC Int'l, Inc. v. Skippy, Inc.,*
214 F.3d 456 (4th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Downing v. Abercrombie & Fitch,*
265 F.3d 994 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

*E. & J. Gallo Winery v. Encana Corp.,*
503 F.3d 1027 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Grosjean v. American Press, Inc.,*
297 U.S. 233 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Helman v. Alcoa Global Fasteners Inc.,*
2009 U.S. Dist. LEXIS 64720 (C.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . 17

*Hilton v. Hallmark Cards,*
580 F.3d 874 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hoffman v. Capital Cities/ABC, Inc.,*
255 F.3d 1180 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kournikova v. General Media Commc'ns, Inc.,*
278 F. Supp. 2d 1111 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mattel, Inc. v. MCA Records, Inc.,*
269 F.3d 894 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

*SCO Group, Inc. v. Novell, Inc.*
2010 U.S. Dist. LEXIS 20244 (D. Utah Mar. 5, 2010) . . . . . . . . . . . . . . . . . . . . 10

## FEDERAL STATUTES

28 U.S.C. § 1292 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## STATE STATUTES

Cal. Civil Code § 3344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Pursuant to 28 U.S.C. § 1292(b) and the Federal Rules of Appellate Procedure, Rule 5(a), defendant AT&T Mobility, LLC ("AT&T"), files this petition for permission to appeal the District Court's order of December 7, 2009 denying AT&T's motion for summary judgment ("Petition"). By order dated March 12, 2010 and entered on March 15, 2010 ("March 15th Order"), the District Court certified the matter for immediate appeal. Both of the District Court's orders are attached to this Petition. *See* Exhibits A and B.

## I.

## INTRODUCTION

This Petition raises the issue of the First Amendment protections afforded corporate noncommercial speech. Earlier this year, the United States Supreme Court reaffirmed that "First Amendment protection extends to corporations." *Citizens United v. Federal Election Comm'n*, __ U.S. __, 130 S. Ct. 876, 899 (2010). However, the "boundary between commercial and noncommercial speech has yet to be clearly delineated." *Mattel, Inc. v. MCA Records, Inc.*, 269 F.3d 894, 906 (9th Cir. 2002); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001). Hearing this appeal will allow this Court to establish the extent of free speech protection afforded to a corporate press release, a recurring issue on which there is not yet established precedent.

1

In its certification order, the District Court held that a threshold issue in this case is whether AT&T's press release entitled "Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season" ("the Press Release") is noncommercial speech.[1] The Press Release addressed a matter of great public concern – the reliability of wireless services following a major natural disaster, such as Hurricane Katrina. The intended audience for the Press Release was journalists, not consumers. The information in the Press Release was repeated in newscasts, not commercials. However, in finding that the Press Release was commercial speech, the District Court disregarded the fact that the publication at issue was a "Press Release," and not advertising.

An immediate appeal is needed because the commercial speech test as applied by the District Court to the Press Release equates corporate speech with commercial speech. The First Amendment jurisprudence of the Supreme Court and this Court do not allow such a reductionist analysis. Both this Court and the Supreme Court have scrupulously avoided broad holdings that would deny businesses their fundamental constitutional right to engage in speech protected by the First Amendment, even where that speech may serve an economic interest. As

---

[1] On March 27, 2008, pursuant to the parties' stipulation, the District Court ordered AT&T Mobility LLC be substituted in for defendant Cingular Wireless LLC, which had been acquired by AT&T.

2

issuing a press release is a corporation's primary means of speaking in a way that does not use advertising, press releases should be entitled to full First Amendment protection.

This threshold issue – the proper application of the test under the First Amendment to determine if the Press Release is noncommercial speech – is a controlling legal issue in this case. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983). The resolution of this issue by immediate appeal will materially advance the litigation because the First Amendment is a complete defense to all of Plaintiff's claims and, thus, a decision in AT&T's favor will terminate the litigation without the necessity of trial.

In addition, a ruling from this Court will impact every business that issues press releases or engages in noncommercial speech. A ruling by the Ninth Circuit will provide much needed precedential guidance for future cases involving the First Amendment's protection of speech by business entities.

## II.

## STATEMENT OF FACTS

### A.    AT&T Issues A Press Release Regarding Disaster Preparedness

The essential facts underlying this action are largely undisputed. It is undisputed that on May 17, 2006, Cingular Wireless issued a press release entitled

3

"Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season." 2 PA 341-42.[2] The Press Release was released through PR Newswire and posted on Cingular's website. 1 PA 47. The information provided in the Press Release was the subject of several news items pertaining to disaster preparedness in light of the looming hurricane season. 1 PA 168-69. The Press Release contained information about Cingular's "preparedness for disasters, such as hurricanes," as well as information about Cingular's "emergency preparedness equipment, such as its mobile command centers." 2 PA 352-53. The Press Release was issued following the disastrous 2005 hurricane season in which Hurricanes Katrina, Wilma, and Rita caused substantial damage to the Gulf Coast states, and the wireless infrastructure therein. 1 PA 49. The Press Release was intended to convey information that was interesting and useful to residents of the southeastern United States, which had suffered the most from those hurricanes. 1 PA 49.

The Press Release is 755 words long. 1 PA 47. It contained a single sentence in a quote mentioning the historic flight of plaintiff General Charles E.

---

[2] In this brief, Petitioner uses the following abbreviations to cite to the record. The abbreviation "PA" is for the two-volume Petitioner's Appendix. The abbreviation "CR" is a citation to the docket number in the District Court Clerk's Record.

"Chuck" Yeager ("Plaintiff"), during which he broke the sound barrier for the first time. 2 PA 352. That quote appears in the middle of the fifth paragraph of the Press Release, and reads: "Nearly 60 years ago, the legendary test pilot Chuck Yeager broke the sound barrier and achieved Mach 1. Today, Cingular is breaking another kind of barrier with our MACH 1 and MACH 2 mobile command centers, which will enable us to respond rapidly to hurricanes and minimize their impact on our customers," de la Vega said. 2 PA 342.

Plaintiff admits that the Press Release does not propose any commercial transaction and does not offer for sale any specific products or services. 1 PA 51. It is undisputed that the Press Release does not state that Plaintiff endorses Cingular, AT&T, or any of their products or services. 1 PA 51. It is also undisputed that the Press Release does not state that Plaintiff is "affiliated with Cingular, AT&T or any of their products or services." 2 PA 307. Nor does the Press Release state that Plaintiff has benefitted from, or even purchased, any products or services offered by Cingular. 1 PA 52. Plaintiff admits that the only thing the Press Release says about him is that he is a legendary test pilot who broke the sound barrier and achieved Mach 1 nearly sixty years ago, which is, of course, a historical fact. 1 PA 52.

**B.     The Press Release Generates Significant News Coverage For The Disaster Preparedness Program.**

The information in the Press Release received significant news coverage.  1 PA 168-69.  As a result of the Press Release, Cingular's emergency preparedness program was the subject of news stories on national news wires such as Reuters and the Associated Press.  1 PA 168.  It also generated regional coverage in the Clarion Ledger, Tampa Tribune, Augusta Chronicle, Florida Times-Union, Shreveport Times, and Orlando Sentinel.  1 PA 168.  Additional news coverage appeared in trade journals and on CNN and local television news stations in Florida.  1PA 168-69.

**C.     AT&T Moves For Summary Judgment, Arguing, Among Other Things, That The Press Release Is Not Commercial Speech.**

On the basis of this undisputed factual record, AT&T moved for summary judgment on Plaintiff's six claims for violation of common law right to privacy, violation of his right to publicity under California Civil Code section 3344, violation of the Lanham Act, unfair business practices, false advertising and unjust enrichment.  2 PA 335.

The First Amendment is central to AT&T's defense and summary judgment motion.  In its motion, AT&T argued that Plaintiff's claims for common law and statutory misappropriation failed as a matter of law because the Press Release

6

contains newsworthy matter and is protected noncommercial speech. In addition, with respect to its Lanham Act claims, AT&T contended that Plaintiff's claim failed because, when a public figure plaintiff brings a false endorsement claim against noncommercial speech, that plaintiff has to prove intent to deceive and Plaintiff failed to do so here.

On December 7, 2009, the District Court denied AT&T's motion. The District Court's conclusion that, as a matter of law, the Press Release is commercial speech is a threshold issue in this case. *See* Exh. A at 13:1-3.

**D.     The Parties Stipulate To Vacate The Trial Date And Stay The Action.**

On December 28, 2009, pursuant to the parties' stipulation, the District Court entered an order staying the action to allow AT&T to seek certification of the December 7th Order and vacating the trial date. 1 PA 23. Thus, this case is not presently set for trial.

**E.     The District Court Grants AT&T's Motion For Certification Based Upon The Controlling Legal Issue Regarding Commercial Speech.**

On January 8, 2010, AT&T filed a motion for certification of appeal pursuant to 28 U.S.C. § 1292(b). CR 69, 70, 71. Plaintiff opposed the motion. CR 74. The District Court certified the appeal by order dated March 12, 2010, which was subsequently docketed and served on March 15, 2010. CR 75.

7

## III.

## CONTROLLING QUESTION OF LAW PRESENTED

The first factor under 28 U.S.C. § 1292(b) is whether the challenged "order involves a controlling question of law." 28 U.S.C. § 1292(b); *see In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982) ("[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of the litigation in the district court."); *see E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1032-33 (9th Cir. 2007) (allowing immediate appeal from denial of motion for summary judgment). The controlling question of law presented in this case is:

> Can speech by a corporation be properly characterized as commercial speech if it (1) does not propose any commercial transaction, (2) does not identify any products or services for sale, and (3) contains information about disaster preparedness, which received extensive coverage by independent print and electronic media coverage as a subject of public interest?

In its March 15th Order, the District Court found that this is a controlling legal issue and reasoned as follows:

> Specifically, the court's conclusion regarding the commercial nature of the publication is a threshold matter in this case. First, resolution of the issue on appeal could materially affect the outcome of litigation because, if the Ninth Circuit concludes the publication is not commercial speech, the viability of all of plaintiff's claims is called into question.

Exh. B at 4:16-20.

8

## IV.

## SUBSTANTIAL GROUND FOR A DIFFERENCE OF OPINION

The second factor under section 1292(b) is that there must be substantial ground for a difference of opinion on the question of law. 28 U.S.C. § 1292(b). "Disagreement with the Court's ruling does not create a 'substantial ground for difference'; the proponent of an appeal must make some greater showing." *Association of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1090 (E.D. Cal. 2008). In denying AT&T's motion for summary judgment, the District Court found that the Press Release should be characterized as commercial speech. Exh. A at 13:1-3. However, as acknowledged by the District Court, the arguments in opposition to that ruling are very strong:

> Second, there is substantial ground for a difference of opinion regarding whether the publication was commercial speech under both Supreme Court and Ninth Circuit precedent. While the court considered the publication in this case analogous to the publications at issue in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983), and *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001),[3] there is no precedential authority directly on

_____

[3] In *Downing*, the publication at issue was defendant Abercrombie & Fitch's clothing catalogue, called the "Quarterly." *Downing*, 265 F.3d at 999. The Quarterly accounted for 80% of Abercrombie's overall advertising budget. *Id.* Abercrombie argued that, under the First Amendment, the challenged publication was noncommercial because plaintiffs' photograph illustrated an article about surfing, a matter in the public interest. *Id.* at 1002. This Court rejected the

point.

Exh. B at 4: 20-27.

**A.  Whether A Press Release Is Noncommercial Speech Is An Issue Of First Impression In This Circuit.**

A substantial ground for a difference of opinion exists because of the lack of controlling precedent regarding whether a press release is noncommercial speech.[4] The Press Release is distinct from other publications that courts have determined are commercial speech. The audience for the Press Release was journalists, not the consumers of wireless services. That audience – the journalists – generated numerous news stories from the information in the Press Release. *See* 1 PA 168-69. The Press Release's purpose was to persuade journalists to exercise their own First Amendment rights to create noncommercial, fully protected speech

_____

argument and held that "the illustrative use of [plaintiffs'] photograph does not contribute significantly to a matter of public interest." *Id.* In sharp contrast, the present case involves a Press Release regarding disaster preparedness.

[4] While Petitioner found no controlling precedent in this Circuit, other courts have found that press releases are not commercial speech. *Accenture Global Servs. GMBH v. Guidewire Software, Inc.*, 581 F. Supp. 2d 654, 667-68 (D. Del. 2008) (held press release issued by business entity was not commercial speech because it did not invite a commercial transaction); *SCO Group, Inc. v. Novell, Inc.*, 2010 U.S. Dist. LEXIS 20244 *17-18 (D. Utah Mar. 5, 2010) (held press release issued by defendant corporation was not commercial speech; "[C]onsidering each of the *Bolger* factors and these press releases as a whole, the Court finds that Defendant's possible economic interest in making these statements alone does not convert these press releases into commercial speech").

10

intended to inform the public. *See Grosjean v. American Press, Inc.*, 297 U.S. 233, 250 (1936) ("The newspapers, magazines and other journals of the country, it is safe to say, have shed more light on the public and business affairs of the nation than any other instrumentality of publicity . . .").

**B.      The District Court's Application Of *Bolger* Is In Error.**

In support of its ruling on summary judgment that the Press Release was commercial speech, the District Court relied upon *Bolger*, 463 U.S. at 66. *See* Exh. A at 9:3-4. Yet, the *Bolger* case is readily distinguishable. The publications at issue in *Bolger* were a series of flyers distributed by a pharmaceutical company. Some of those flyers clearly proposed commercial transactions, while others were "informational" in nature without explicitly proposing a commercial transaction. The Supreme Court's commercial speech analysis begins by recognizing that the "core notion of commercial speech" is "speech that does no more than propose a commercial transaction." *Bolger*, 463 U.S. at 66. The Supreme Court found even the "informational pamphlets" to be commercial speech because (1) the company conceded that they were advertisements, (2) they referred to a specific product, and (3) the distributor of the publication had an economic motivation for mailing the publication. *Bolger*, 463 U.S. at 66-68.

This Court has strictly adhered to *Bolger* and its three factor analysis. In

11

*American Academy of Pain Management v. Joseph,* the Court relied on *Bolger,* stating that "the Supreme Court held that speech could properly be characterized as commercial when (1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech." *American Academy,* 353 F.3d 1099, 1106 (9th Cir. 2004).

Here, two of the three *Bolger* factors are missing. First, nowhere does AT&T concede that the Press Release constitutes advertising. Indeed, it is undisputed that the Press Release does not propose any commercial transaction at all. 1 PA 51. The Press Release is exactly what it purports to be: a Press Release. Moreover, several newspapers, trade journals, and TV stations found the Press Release to be a matter of public interest and thus reported on its newsworthy content. 1 PA 168-69. Such press coverage illustrates that the Press Release was indeed speech to journalists aimed at persuading them to cover an important story, and not advertising intended to be read by consumers. Therefore, the first *Bolger* factor favors a finding that the Press Release is not commercial speech.

Second, it is undisputed that the Press Release did not mention any specific service or product for sale. 1 PA 51. The District Court stated that this prong is satisfied because "Defendant's name as a service provider is mentioned multiple times throughout the Publication." Exh. A at 10:27-28. Yet, the "name"

12

that is mentioned is the name of Cingular, the company, not a "specific" Cingular product as required by the Ninth Circuit. *See American Academy*, 353 F.3d at 1106. A significant difference exists between mentioning a company's name versus mentioning its service or product. Just as Coca Cola the company is not Coca Cola the product, Cingular Wireless Services, the company, is not the Cingular Wirelesss cell phone plan. Thus, because the Press Release does not mention any specific product, the second prong of the *Bolger* test also favors a finding of noncommercial speech.

Third, the District Court found that AT&T had an economic motive in issuing the Press Release because it informed the reader that AT&T's wireless service specifically had been improved, and because the writer of the Press Release testified that its purpose was, in part, to create "positive associations with the AT&T brand." Exh. A at 11:5-6. Neither of these determinations satisfies the "economic motive" prong. No evidence was presented that AT&T's primary motive for issuing the Press Release was to increase sales. That the author, Mr. Siegel, desired to create positive associations with the AT&T brand is not surprising and is unavoidable, given that he is employed by AT&T and that AT&T was issuing the Press Release. All corporations presumably have the motive of creating positive associations with their brands through corporate speech, but that

13

does not mean that all corporate speech is, therefore, commercial speech.

In sum, the District Court erred in its application of the *Bolger* test. At least two of the three *Bolger* factors are not satisfied here. Accordingly, there is a substantial basis for disagreement with the District Court's order denying summary judgment.

### C. The Press Release Does Not Propose A Commercial Transaction.

There also is a substantial ground for a difference of opinion because the Press Release did not propose a commercial transaction. In *Bolger*, the Supreme Court explained that the most critical element to be considered to determine if speech is commercial is whether the speech at issue "does no more than propose a commercial transaction." *Bolger*, 463 U.S. at 66. If it does, then the speech should be deemed noncommercial speech. This Court has reiterated that proposing a commercial transaction is the core of commercial speech. *See, e.g., Hilton v. Hallmark Cards,* 580 F.3d 874, 885 fn. 7 (9th Cir. 2009) ("As one of our sister circuits has recognized, under this definition, 'commercial speech is best understood as speech that merely advertises a product or service for a business purpose.'"); *Mattel,* 296 F.3d at 906 ("If speech is not 'purely commercial' – that is, if it does more than propose a commercial transaction – then it is entitled to full First Amendment protection."); *Hoffman,* 255 F.3d at 1185 (recognizing that

14

where any commercial aspects are "inextricably entwined" with expressive elements they receive full First Amendment protection as noncommercial speech). In addition, this Court has further explained that "[c]ommercial speech represents 'expression related *solely* to the economic interests of the speaker and the audience' . . . and 'does no more than propose a commercial transaction.'" *American Academy*, 353 F.3d at 1106 (emphasis added).[5]

Here, the Press Release does not propose a commercial transaction at all. The main purpose of the Press Release was to persuade journalists to disseminate information to the public through the media about the availability of cellular service following a hurricane. Such information provides a public service. Nor does the Press Release relate to the economic interests of its audience – the media. Because the Press Release does not propose a commercial transaction and does not relate *solely* to the economic interests of the speaker and its audience, it does not constitute commercial speech.

_____

[5] *See also Commodity Trend Serv. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 684-86 (7th Cir. 1998) (holding advertised publications were not commercial speech because they did not propose a commercial transaction); *CPC Int'l, Inc. v. Skippy, Inc.*, 214 F.3d 456 (4th Cir. 2000) (distinguishing *Bolger* because the speech did not propose a commercial transaction).

**D.     Under The District Court's Analysis, All Press Releases Issued By Businesses Will Be Deemed Commercial Speech.**

It is axiomatic that every press release issued by a business will mention the business' name. It also goes without saying that businesses always have a general economic motive in issuing press releases, and that press releases are usually issued in order to create positive associations with the business. Thus, under the *Bolger* test as applied by the District Court, all press releases will now be deemed commercial speech. This is not the law. This Circuit has said that "the core notion of commercial speech is that it does no more than propose a commercial transaction." *Hoffman*, 255 F. 3d at 1184. Here, it is undisputed that the Press Release does not propose any commercial transaction. Thus, as the Press Release lacks the core element for defining commercial speech, and as the *Bolger* factors as applied by this Court favor a finding that the Press Release is noncommercial speech, substantial grounds for disagreement exist as to the District Court's holding that the Press Release is commercial speech.[6]

---

[6] The infringement on AT&T's First Amendment rights is even more egregious given the factual circumstances of this case. It is undisputed that the Press Release only mentioned Plaintiff's name once in the fifth paragraph discussing his historical flight. There is no evidence that this incidental use caused any economic benefit to AT&T, or was intended by AT&T to associate plaintiff's name with the AT&T brand. Nor was there any evidence that consumers were confused into believing that Plaintiff endorsed AT&T or its products and services, which is the very essence of a Lanham Act claim. To hold

16

## V.

## AN IMMEDIATE APPEAL WILL MATERIALLY ADVANCE

## THE LITIGATION

The third and final factor that must be satisfied under 28 U.S.C. § 1292(b) is whether an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see In re Cement Antitrust Litig.*, 673 F.2d at 1026-27. "The controlling question does not need to dispose of the litigation, only advance its ultimate termination." *Association of Irritated Residents*, 634 F. Supp. 2d at 1092. "Immediate appeal should be granted where there is 'a highly debatable question that is easily separated from the rest of the case, that offers an opportunity to terminate the litigation completely, and that may spare the parties the burden of a trial that is expensive for them even if not for the judicial system.'" *Helman v. Alcoa Global Fasteners Inc.,* 2009 U.S. Dist. LEXIS 64720, *17 (C.D. Cal. 2009), quoting Wright, Miller, & Cooper, Federal Practice & Procedure, Jurisdiction 2d § 3930, at 436 (1996). In its March 15th Order, the District Court found that "because the determination of the nature of the speech is a controlling issue with respect to defendant's liability, an immediate appeal will materially

that AT&T can be held liable for violating Plaintiff's rights of publicity in such circumstances plainly does grave injustice to AT&T's significant rights of free speech.

17

advance the ultimate termination of the litigation." Exh. B at 4:27-5:2.

As recognized by the District Court, an immediate appeal will materially advance the ultimate termination of the litigation. If this Court finds that the Press Release is noncommercial speech, all of Plaintiff's causes of action fail, and the parties need not go to trial. Specifically:

- The First Amendment defense defeats both the common law and statutory misappropriation of likeness claim. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) ("Under both the common law cause of action and the statutory cause of action, no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.").

- If the Press Release is noncommercial speech, then Plaintiff's false endorsement claim under the Lanham Act fails as well. If the speech is noncommercial, Plaintiff must prove by clear and convincing evidence that AT&T subjectively intended to deceive consumers into believing that Plaintiff endorsed AT&T. *Hoffman*, 255 F.3d at 1185; *Kournikova v. General Media Commc'ns, Inc.*, 278 F. Supp. 2d 1111, 1129 (C.D. Cal. 2003). Plaintiff's opposition to summary judgment

18

shows that he has no such evidence of an actual intent to deceive.
1 PA 149.

- The remaining causes of action are derivative of the misappropriation
  and false endorsement claims. Without misappropriation or false
  endorsement, there is no unfair competition or unjust enrichment.
  Likewise, without false endorsement or commercial speech, there is
  no false advertising. *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d
  1013, 1037 (C.D. Cal. 1998) ("Section 17500 bars dissemination of
  any statement regarding the sale of personal property 'which is untrue
  or misleading, and which is known, or which by the exercise of
  reasonable care should be known, to be untrue or misleading.'").

Moreover, this issue is sufficiently important that it will materially advance
the resolution of other existing and prospective lawsuits. Corporations frequently
invoke the names of living and deceased historical figures in the course of
describing corporate innovations and achievements. Already, General Yeager has
filed suit against AMD in Santa Clara Superior Court for mentioning his name
(and that of Neil Armstrong) in relation to a new computer processor. 1 PA 3.
Plaintiff has also very recently sued Virgin Atlantic Airlines in San Francisco
Superior Court because Virgin Atlantic mentioned his name (and that of Buzz

19

Aldrin) in connection with new features on its airplanes.  *See* 1 PA 13.  This Court should allow this immediate appeal of a decision that has the potential to increase right of publicity litigation dramatically, and to decrease the freedom of corporate entities to speak freely as well.

## VI.

## CONCLUSION

For all of the foregoing reasons, AT&T respectfully requests that this Court exercise its discretion to hear this appeal and grant AT&T's Petition for leave to file an immediate appeal pursuant to 28 U.S.C. § 1292(b).

DATED: March 25, 2010          MENNEMEIER, GLASSMAN & STROUD LLP

Andrew W. Stroud
Attorneys for Petitioner/Defendant
AT&T Mobility, LLC

20

Certificate of Compliance

I certify that:

This brief is 20 pages long and complies with the length limits set forth at Fed. R. App P. 5(c).

Dated: March 25, 2010                    MENNEMEIER, GLASSMAN & STROUD LLP

By: _____
                    Andrew W. Stroud
        Attorneys for Petitioner AT&T Mobility, LLC

# CERTIFICATE OF SERVICE

# BY OVERNIGHT DELIVERY

I hereby certify that on the date set forth below, I mailed the following documents:

## PETITION FOR PERMISSION TO APPEAL

on the interested parties in the within action by depositing copies of the above documents in a box or other facility regularly maintained by Federal Express, in an envelope or package designated by Federal Express with delivery fees paid or provided for as follows:

**Charles J. Harder**
Wolf Rifkin Shapiro Schulman & Rabkin, LLP
11400 West Olympic Boulevard
9th Floor
Los Angeles , CA 90064-1582

Dated: March 25, 2010

Cindie Wilding

Exhibit A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

GENERAL CHARLES E. "CHUCK"
YEAGER (RET.),

       Plaintiff,

    v.

CINGULAR WIRELESS LLC;
BELLSOUTH; SBC COMMUNICATIONS;
AMERICAN TELEPHONE & TELEGRAPH;
and DOES 1 to 200, inclusive,

       Defendants.

NO. 2:07-cv-02517 FCD GGH

<u>MEMORANDUM AND ORDER</u>

----ooOoo----

    This matter comes before the court on defendant AT&T Mobility, LLC's ("AT&T" or "defendant")[1] motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Plaintiff General Charles E. "Chuck" Yeager ("Yeager" or "plaintiff") opposes the motion.  For the reasons

_____

    [1]   On March 27, 2008, pursuant to the parties' stipulation, the court ordered that AT&T Mobility LLC be substituted as defendant.  All other named defendants were dismissed without prejudice.  (Stip. & Order [Docket #12], filed Mar. 27, 2008.)

1

set forth herein,[2] defendant's motion for summary judgment is DENIED.

### BACKGROUND[3]

This case arises out of the use of plaintiff's name in a publication issued by Cingular Wireless entitled "Cingular Wireless Announces Enhanced Emergency Preparedness Program for 2006 Hurricane Season" (the "Publication").[4]   (UMF ¶ 1.) Plaintiff Yeager served in the United States Army Air Corps for many years.   (Dep. of General Charles "Chuck" Yeager ("Yeager Dep."), Ex. B to Decl. of Steven E. McDonald ("McDonald Decl.") [Docket #57], filed Oct. 13, 2009, at 13.)   He was trained to be a combat pilot and a test pilot after enlisting at the age of eighteen.   (Id.)   On October 14, 1947, as part of the mission of the United States Air Force to try to break the sound barrier, Yeager was the first pilot to exceed the speed of sound.   (Id. at 17-18.)

The Publication at issue was released on May 17, 2006 through PR Newswire and posted on Cingular's website.   (UMF ¶ 2.)   The Publication is 755 words long and contains information

[2]   Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs.   See E.D. Cal. L.R. 78-230(h).

[3]   Unless otherwise noted, the facts herein are undisputed.   (See Pl.'s Response to Def.'s Separate Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("UMF") [Docket #56], filed Oct. 13, 2009, at 1-8.)   Where the facts are disputed, the court recounts plaintiff's version of the facts. (See Pl.'s Statement of Disputed Facts ("DF") [Docket #56], filed Oct. 13, 2009, at 8-12.)

[4]   The complaint alleges that defendant Cingular Wireless LLC issued the material, but the Stipulation and Order was based upon express representations that defendant At&T was responsible for the Publication.   (Stip. & Order [Docket #12].)

2

about Cingular's preparedness for disasters, such as hurricanes,
through its emergency preparedness equipment that includes its
MACH1 and MACH2 mobile command centers. (UMF ¶¶ 3, 15.)  In the
fifth paragraph, the Publication also provides:

> Nearly 60 years ago, the legendary test pilot Chuck
> Yeager broke the sound barrier and achieved Mach 1.
> Today, Cingular is breaking another kind of barrier
> with our MACH 1 and MACH 2 mobile command centers,
> which will enable us to respond rapidly to hurricanes
> and minimize their impact on our customers," de la Vega
> said.

(UMF ¶ 4.)

The Publication neither includes a picture of plaintiff nor
mentions plaintiff's name in any headline or headings. (UMF ¶¶
7-8.)  It does not propose a commercial transaction, nor does it
offer for sale any specific products or services. (UMF ¶ 8.)
The Publication also does not state that plaintiff endorses or
has enjoyed benefits from Cingular, AT&T, or any of their
products or services. (UMF ¶¶ 10-11.)

The executive director of media relations for AT&T Mobility
who wrote the Publication, Mark Siegel ("Siegel"), testified
that the purpose of the press release was "two-fold. (DF ¶ 5;
Dep. of Mark Siegel ("Siegel Dep.") at 16:18.)  First, AT&T
sought to demonstrate its commitment "to improve our efforts to
restore services as quickly as possible after a natural
disaster." (Siegel Dep. at 16:18-21.)  Second, it sought "to
create positive associations in people's mind with the AT&T
brand so they would think highly" of the company." (Id. at
16:22-23.)  Siegel noted the connection between MACH, the
acronym for defendant's technology, and MACH, the sound barrier;
he crafted the Publication to make an association between

3

breaking the sound barrier and breaking new barriers of disaster preparedness.  (Id. at 18:12-17; DF ¶ 8.)  Plaintiff contends that AT&T used his name within the Publication in order capitalize upon his name, reputation, and iconic image. Plaintiff further asserts that his name was used as a "hook" to entice an audience to read about defendant's improved services. (See DF ¶¶ 6-7, 11; Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Opp'n"), filed Oct. 13, 2009, at 3.)

Plaintiff brings claims for (1) violation of California common law right to privacy/right to control publicity and likeness (also known as a common law claim for commercial misappropriation); (2) violation of California Civil Code § 3344; (3) violation of the Lanham Act, 15 U.S.C. § 1125(a); (4) unjust enrichment; (5) violation of California Business and Professions Code § 17200; and (6) violation of California False Advertising Act.  (Compl., filed Nov. 21, 2007.)  Defendant seeks summary judgment against plaintiff on all claims for relief.[5]

### STANDARD

The Federal Rules of Civil Procedure provide for summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see California v. Campbell, 138 F.3d 772, 780 (9th Cir.

---

[5]   Plaintiff filed a supplemental opposition to which defendant objects.  The court considers neither plaintiff's supplemental opposition nor defendant's response thereto.

4

1  1998).  The evidence must be viewed in the light most favorable

2  to the nonmoving party.  See Lopez v. Smith, 203 F.3d 1122, 1131

3  (9th Cir. 2000) (en banc).

4      The moving party bears the initial burden of demonstrating

5  the absence of a genuine issue of fact.  See Celotex Corp. v.

6  Catrett, 477 U.S. 317, 325 (1986).  If the moving party fails to

7  meet this burden, "the nonmoving party has no obligation to

8  produce anything, even if the nonmoving party would have the

9  ultimate burden of persuasion at trial." Nissan Fire & Marine

10  Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102-03 (9th Cir. 2000).

11  However, if the nonmoving party has the burden of proof at

12  trial, the moving party only needs to show "that there is an

13  absence of evidence to support the nonmoving party's case."

14  Celotex Corp., 477 U.S. at 325.

15      Once the moving party has met its burden of proof, the

16  nonmoving party must produce evidence on which a reasonable

17  trier of fact could find in its favor viewing the record as a

18  whole in light of the evidentiary burden the law places on that

19  party.  See Triton Energy Corp. v. Square D Co., 68 F.3d 1216,

20  1221 (9th Cir. 1995).  The nonmoving party cannot simply rest on

21  its allegations without any significant probative evidence

22  tending to support the complaint.  See Nissan Fire & Marine, 210

23  F.3d at 1107.  Instead, through admissible evidence the

24  nonmoving party "must set forth specific facts showing that

25  there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

26  /////

27  /////

28  /////

**ANALYSIS**

**A.    Common Law and Statutory Claims for Misappropriation**

Plaintiff claims that defendant violated his rights to control the use of his name and identity because defendant made unauthorized use of plaintiff's name to promote defendant's unrelated products and services.  (Pl.'s Opp'n Mot. Summ. J. ("Pl.'s Opp'n"), filed Oct. 13, 2009, at 9.)  "California recognizes, in its common law and its statutes, 'the right of a person whose identity has commercial value–most often a celebrity–to control the commercial use of that identity.'"  Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1184 (9th Cir. 2001)(quoting Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1098 (9th Cir. 1992)).  To state a claim for misappropriation of likeness under common law, a plaintiff must prove: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.  Downing v. Abercrombie & Fitch, 265 F.3d 994, 1001 (9th Cir. 2001) (citing Eastwood v. Superior Court, 149 Cal. App. 3d 409, 417 (1983)).  Section 3344 of the California Civil Code complements the common law cause of action for commercial misappropriation.  See Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 414 (9th Cir. 1996).  A plaintiff making a claim under Section 3344 must "allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose," in addition to proving the

6

elements of the common law cause of action.[6] <u>Downing</u>, 265 F.3d at 1001.

Defendant argues that summary judgment should be granted as to both plaintiff's common law and statutory claims based upon the applicability of two affirmative defenses, arguing that (1) the First Amendment protects the Publication because it contains newsworthy matter and is not commercial speech; and (2) the doctrine of incidental use protects the "fleeting and inconsequential" use of plaintiff's name. (Def.'s Mem. Mot. Summ. J. ("Def.'s Mem."), filed Oct. 1, 2009.)

1.    **The First Amendment Defense**

"Under both the common law cause of action and the statutory cause of action, 'no cause of action will lie for the publication of matters in the public interest, which rests on the right of the public to know and the freedom of the press to tell it.'" <u>Downing</u>, 265 F.3d at 1001 (quoting <u>Montana v. San Jose Mercury News</u>, 34 Cal. App. 4th 790, 793 (1995)). "The First Amendment requires that the right to be protected from unauthorized publicity 'be balanced against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press.'" <u>Gionfriddo v. Major League Baseball</u>, 94 Cal. App. 4th 400, 409 (1st Dist. 2001) (quoting <u>Gill v. Hearst Publ'g Co.</u>, 40 Cal. 2d 224, 228 (1953));

---

[6]    California Civil Code § 3344(a) provides in relevant part that "[a]ny person who knowingly uses another's name . . . in any manner . . . for purposes of advertising or selling, or soliciting purchases of . . . goods or services, without such person's prior consent . . . shall be liable for any damages sustained by the person or persons injured as a result thereof."

1  Downing, 265 F.3d at 1001 (noting that the court "must find a
2  proper accommodation between the competing concerns of freedom
3  of speech and the right of publicity).  In order to balance
4  these countervailing interests, a court must consider "the
5  nature of the precise information conveyed and the context of
6  the communication."  Id. at 410.
7      The First Amendment defense extends to publications about
8  people "who, by their accomplishments, . . . create a legitimate
9  and widespread attention to their activities."  Eastwood v.
10 Superior Court, 149 Cal. App. 3d 409, 422 (1983).  Nevertheless,
11 "this defense is not absolute."  Downing, 265 F.3d at 1001.  A
12 tenuous connection between the unauthorized use of a person's
13 name or likeness and the matter of public interest can remove
14 the publication from the First Amendment's protection.  See id.
15 at 1002.  Moreover, if the speech is classified as commercial
16 speech, it is not actionable "when the plaintiff's identity is
17 used, without consent, to promote an unrelated product."
18 Gionfriddo v. Major League Baseball, 94 Cal. App. 4th 400, 413
19 (2001); Hoffman, 255 F.3d at 1185 (noting that when a defendant
20 uses "an aspect of the celebrity's identity entirely and
21 directly for the purpose of selling a product," such use does
22 not "implicate the First Amendment's protection of expressions
23 of editorial opinion").
24          a.   Commercial Speech
25      Defendant argues that the Publication is noncommercial
26 speech that deserves the full protection of the First Amendment.
27 (Def.'s Mem. at 10-11.)  Specifically, defendant contends it is
28 undisputed that the Publication does not propose any commercial

transactions and does not offer any products or services.  (Id.)

The "core notion" of commercial speech is that it "does not more than propose a commercial transaction." Bolger v. Youngs Drug Prods. Co., 463 U.S. 60, 66 (1983) (citations and quotations omitted); see Hoffman, 255 F.3d at 1184.  However, the "boundary between commercial and noncommercial speech has yet to be clearly delineated." Hoffman, 255 F.3d at 1184.  On one end of the spectrum, an advertisement is "clearly commercial speech." Id. at 1185; see e.g. Abdul-Jabbar, 85 F.3d at 409; Waits, 978 F.2d at 1097-98.  On the other end of the spectrum is speech that, when viewed as a whole, expresses editorial comment on matters of interest to the public.  See Hoffman, 255 F.3d at 1185 (holding that magazine article that used an altered photograph of a male celebrity to showcase a designer gown was noncommercial speech because the article did not have the sole purpose of selling a particular product, complemented the magazine issue's focus on Hollywood part and present, and combined fashion photography, humor, and visual and verbal editorial comment); Montana, 34 Cal. App. 4th at 793-95 (holding that relatively contemporaneous reprinting of poster of football player that appeared in newspaper article about Super Bowl victory received full protection under the First Amendment).

Informational publications that refer to or promote a specific product, but are not mere proposals to engage in commercial transactions, present a closer question regarding the appropriate classification of the type of speech. Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-67 (1983).  In Bolger, the court considered whether the plaintiff's informational

9

1    pamphlet was commercial or noncommercial speech in order to

2    determined the extent of First Amendment Protection.  Id.  The

3    eight page pamphlet, entitled "Plain Talk about Venereal

4    Disease," provided information regarding the prevention of

5    venereal diseases and repeatedly discussed the advantages of

6    using condoms without any specific reference to those

7    manufactured by the plaintiff.  Id. at 62 n.4, 66 n.13.  The

8    single reference to the plaintiff's specific product was at the

9    very bottom of the last page, which stated that the pamphlet was

10   contributed as a public service by the plaintiff, who

11   distributed condoms.  Id.  The Court noted that the pamphlet

12   contained discussions of important public issues.  Id. at 67.

13   However, the Court also made clear that "advertising which links

14   a product to a current public debate is not thereby entitled to

15   the constitutional protection afforded noncommercial speech."

16   Id. at 68 (quoting Central Hudson Gas & Elec. Corp. v. Pub.

17   Serv. Comm'n of N.Y., 447 U.S. 530, 563 n.5).  Based upon the

18   totality of the characteristics of the pamphlet, namely that the

19   plaintiff had an economic motive in mailing the pamphlets, it

20   was conceded to be an advertisement, and it referenced a

21   specific product, the Court held that the pamphlet was properly

22   characterized as commercial speech.  Id.

23        In this case, looking at all of its characteristics, the

24   Publication is properly categorized as commercial speech.  The

25   central theme of the Publication is how defendant's emergency

26   preparedness program enhances its wireless services.

27   Defendant's name as a service provider is mentioned multiple

28   times throughout the Publication.  Further, the Publication did

1  not seek to inform the reader about emergency preparedness

2  generally, but rather how defendant's wireless service

3  specifically had been improved to handle such emergencies.

4  Indeed, the writer of the Publication testified that the purpose

5  of the Publication was, in part, to create positive associations

6  with the AT&T brand.  (See Siegel Deposition 16:18-23.)  As

7  such, it is reasonable to infer that defendant had an economic

8  motivation underlying the Publication's distribution.  Further,

9  defendant's name as a service provider is mentioned multiple

10  times throughout the Publication.  While none of these facts

11  alone is necessarily dispositive, a review of the Publication as

12  a whole supports a finding that it is commercial speech.

13       The facts of the case are similar to those the Court found

14  dispositive in Bolger.  463 U.S. 60.  In both cases, the speech

15  did not directly propose any commercial transactions or offer

16  any products or services.  See id. at 62 n.4.  Rather, the

17  material emphasized the benefits of defendant's product

18  generally.  See id.  Further, in this case, defendant's service

19  was explicitly referred to throughout the body of the writing,

20  while in Bolger, the distributor's specific product was

21  referenced only once at the end of the pamphlet.  See id.

22  Accordingly, even though both the Publication in this case and

23  the pamphlet in Bolger contained discussions of important public

24  issues, because the Court concluded the content of the pamphlet

25  supported a finding of commercial speech, the content of the

26  Publication similarly supports such a finding.

27       Defendant argues that, similar to Hoffman, the commercial

28  aspects of the Publication are intertwined with expressive

11

1   aspects, thus protecting the Publication as a whole as
2   noncommercial speech. (Def.'s Mem. at 11.) However, the facts
3   before the court in Hoffman are distinguishable from the facts
4   before the court in this case. At issue in Hoffman was a
5   feature article in a magazine that complemented the issue's
6   focus on the history of Hollywood. Hoffman, 255 F.3d at 1185.
7   Viewing the article in context, the Hoffman court described it
8   as a combination of fashion photography, humor, and visual and
9   verbal editorial comment, implicating the First Amendment's
10  protection of expressions of editorial opinion. Id. The
11  Hoffman court also noted that the defendant received no
12  consideration from the designers for featuring the clothing in
13  the altered photograph. Id. at 1185. Under these facts, the use
14  of the altered photograph as an illustration in the article
15  constituted protected noncommercial use. Id. at 1186. In this
16  case, however, the Publication's sole purpose was to promote
17  defendant's services. It provided information about defendant's
18  program, but expressed no editorial comment on public safety
19  issues during a natural disaster or any other related issue.
20  Accordingly, the First Amendment's protection of expressions of
21  editorial opinion is not likewise implicated under the facts in
22  this case. See Downing, 265 F.3d at 1003 n.2 (distinguishing
23  from Hoffman because the defendant used plaintiffs' names and
24  photographs to promote its products while the magazine in
25  Hoffman was unconnected to and received no consideration for
26  showcasing the designer dress).
27  /////
28  /////

Therefore, the court concludes that the Publication at issue is commercial speech for purposes of the First Amendment defense.

### b.    Newsworthiness

Defendant also argues that the First Amendment protects the Publication's use of plaintiff's name because the Publication reported on matters of public interest.  (Def.'s Mem. at 9.) Specifically, defendant argues that the Publication was issued subsequent to the devastation wrought by Hurricane Katrina, Hurricane Wilma, and Hurricane Rita.[7]  Defendant characterizes the information in the Publication as information addressing public safety concerns and whether its customers can continue to rely on defendant's services during a natural disaster. Plaintiff contends that defendant's Publication was not issued solely to convey information of public interest, but rather, "was directed for a profit commercial enterprise."  (Opp'n at 3.)

Where a plaintiff's identity is used, without consent, to promote an unrelated product, such speech is actionable.  See Downing, 265 F.3d 994; Newcombe v. Adolf Coors Co., 157 F.3d 686, 691-94 (9th Cir. 1998) (use of pitcher's image in beer advertisement); Abdul-Jabbar, 85 F.3d at 409 (use of basketball star's former name in a television car commercial); Waits, 978 F.2d at 1097-98 (use of imitation of singer's voice in a radio snack-food commercial); White v. Samsung Electronics Am., Inc.,

-----

[7]    The court notes, however, that the Publication contains no editorial expression related to the specified hurricanes.

13

971 F.2d 1395, 1396 (9th Cir. 1992) (use of gameshow hostess's likeness in advertisement for electronic products).  In Downing, clothing manufacturer Abercrombie & Fitch ("Abercrombie") used a photograph of plaintiffs competing in a surfing competition. Downing, 265 F.3d at 1000.  The photograph was placed in a clothing catalog that also included news and editorial pieces about the surfing culture.  Id.  While the surfing theme of the catalog was conceded to be a matter of public interest, the Downing court found that the photograph's use did not contribute significantly to the editorial pieces about surfing culture. Id. at 1002 ("The catalog did not explain that [the plaintiffs] were legends of the sport and did not in any way connect [the plaintiffs] with the story preceding it.").  Rather, the court reasoned that the defendant used the plaintiffs' photograph "essentially as window-dressing to advance the catalog's surf-theme."  Id.  Therefore, because the plaintiffs' likeness was used primarily to attract consumers to the unrelated product for sale in the sales catalog, such use was not protected by the First Amendment defense.  Id.

In this case, the context of the communication and the nature of the information conveyed demonstrate that plaintiff Yeager's name and accomplishments were used to attract attention to defendant's unrelated wireless services.  While emergency preparedness and the availability of wireless services following a natural disaster are matters or public interest and concern, as set forth above, the Publication in this case was not purely informational in nature; rather, it is properly characterized as commercial speech because, *inter alia*, it aimed to positively

14

1   market defendant's services by linking them to that public
2   concern.   Further, plaintiff's name and accomplishments in
3   breaking the sound barrier are wholly unrelated to defendant's
4   mobile command centers and cellular service in emergency
5   situations.[8]   Indeed, as reflected by Siegel's testimony, the
6   use of plaintiff's name was carefully crafted as part of a
7   strategy to promote defendant's brand.   (See Siegel Deposition,
8   at 11:9-12, 16:16-23.)   Even if the content of defendant's
9   Publication could otherwise be considered within the public
10  interest, the illustrative use of plaintiff's name does not
11  contribute significantly to that interest; Like the use in
12  Downing, which the court characterized as "window-dressing," the
13  connection between public safety issues during hurricane season
14  and the use of plaintiff's name is tenuous at best.   See
15  Downing, 265 F.3d at 1002.

16      Accordingly, defendant is not entitled to summary judgment
17  on its asserted First Amendment defense.

18      **2.   Incidental Use**

19      "The contours of the incidental use doctrine are not
20  well-defined in California."  Aligo v. Time-Life Books, Inc.,
21  1994 U.S. Dist. LEXIS 21559, at *6 (N.D. Cal. Dec. 19, 1994).
22  "However, the general rule is that incidental use of a
23  plaintiff's name or likeness does not give rise to liability"
24  under a common law claim of commercial misappropriation or an

25  _____

26      [8]   Furthermore, even though plaintiff's achievement may
    be said to be newsworthy, "its use is not automatically
27  privileged."  See Abdul-Jabbar, 85 F.3d at 456 (holding that the
    newsworthiness of a former basketball player's record-breaking
28  achievement did not entitle the defendant to use the player's
    identity in the context of an unrelated car commercial).

1    action under Section 3344. Id. at *8. The rationale underlying

2    this doctrine is that an incidental use has no commercial value,

3    and allowing recovery to anyone briefly depicted or referred to

4    would unduly burden expressive activity. Pooley v. Nat. Hole-

5    In-One Ass'n, 89 F. Supp. 2d 1108, 1112 (D. Ariz. 2000).

6       Whether the use of a plaintiff's name or likeness falls

7    within the incidental use exception to liability "is determined

8    by the role that the use of the plaintiff's name or likeness

9    plays in the main purpose and subject of the work at issue."

10    Preston v. Martin Bregman Prods., Inc., 765 F. Supp. 116, 119

11    (S.D.N.Y. 1991). Generally, "a plaintiff's name is not

12    appropriated by mere mention of it." Restatement (Second) of

13    Torts § 652C, comment d. A claim is also not actionable when a

14    plaintiff's likeness is appropriated because "it is published

15    for purposes other than taking advantage of his reputation,

16    prestige, or other value associated with him." Id.

17       In determining whether the doctrine of incidental use

18    applies, courts have considered "(1) whether the use has a

19    unique quality or value that would result in commercial profit

20    to the defendant, (2) whether the use contributes something of

21    significance, (3) the relationship between the reference to the

22    plaintiff and the purpose and subject of the work, and (4) the

23    duration, prominence or repetition of the likeness relative to

24    the rest of the publication." Aligo, 1994 U.S. Dist. LEXIS

25    21559, at *7-8 (internal citations omitted). Even if the

26    mention of a plaintiff's name or likeness is brief, if the use

27    stands out prominently within the commercial speech or enhances

28    the marketability of the defendant's product or service, the

doctrine of incidental use is inapplicable.  See Pooley, 89 F.

Supp. 2d at 1113.  In Pooley, the defendant used, without

consent, the name of likeness of the plaintiff, a professional

golfer who was well-known for making a hole-in-one shot and

winning one million dollars as a result, in a marketing video

for its "Million Dollar Hole-in-One" fundraising service.  Id.

at 1110-11.  The footage of the plaintiff constituted only six

seconds of the entire eight minute video.  Id.  While the court

noted the duration of the use was relatively short in relation

to the rest of the publication, the court found that the use was

"crucial" to the defendant's advertisement because without it,

the video would not have been as attractive to the target

audience and because the plaintiff's hole-in-one was not

fungible to that of any other golfer.  Id. at 1112-13.  The

court also found that the plaintiff "was specifically selected

because of his distinction and his wide market appeal."  Id. at

1113.  Accordingly, the court concluded that the incidental use

doctrine did not apply because the use of the plaintiff's name

and likeness was integral to the defendant's advertisement and

"clearly enhanced the marketability of [the] defendant's

services."  Id.; see also Schifano v. Greene County Greyhound

Park, Inc., 624 So. 2d 178, 181 (Ala. 1993) (distinguishing the

incidental use of a photograph of an unidentified and unknown

person from the use of the recognizable name of a former college

football star and an experienced radio announcer for

solicitation purposes); cf. Aligo, 1994 U.S. Dist. LEXIS 21559,

at *8 (holding that four-second appearance of a magazine cover

featuring photograph of unnamed and unidentified plaintiff in a

1   29-minute "infomercial" promoting a rock music anthology was

2   incidental use because it was one of dozens of magazine covers

3   used in the infomercial and insignificant to the purpose of

4   selling a music anthology); Preston, 765 F. Supp. at 118-19

5   (holding that four-second facial appearance of unidentified and

6   unnamed plaintiff in a street scene, shot from a moving vehicle

7   in low light, during the opening credits of a movie was

8   incidental use because it contributed nothing to the movie's

9   storyline); Ladany v. William Morrow & Co., 465 F. Supp. 870,

10  881 (S.D.N.Y. 1978) (holding that incidental use doctrine

11  applied when plaintiff was one of 101 characters in a book

12  discussing in detail the Olympic massacre in Munich and the book

13  referred to plaintiff only when discussing one out of the many

14  aspects of the tragedy).

15       In this case, under the circumstances in which defendant's

16  name and identity was used, the court cannot conclude that the

17  incidental use doctrine applies.  Plaintiff's name and identity

18  is unique and non-fungible in that he is the person associated

19  with breaking the sound barrier for the first time.  The use of

20  his name and identity links defendant's new technology to

21  plaintiff's name and accomplishments.  Indeed, as set forth

22  above, the evidence reveals that the Publication was crafted in

23  order to make that very association and to "create positive

24  associations in people's mind with the AT&T brand."  (Siegel

25  Dep. at 16, 18.)  While the use of plaintiff's name and

26  reference to his accomplishment was a small part of the 755-word

27  Publication, the association of defendant's services with a

28  historical feat is a use that may help to pique the interest of

18

1    a newsman deciding whether to follow up on a press release.

2    (See Deposition of Albert Levy at 111:4-19.)   Therefore, like in

3    Pooley, the use of plaintiff's name and identity uniquely

4    enhanced the marketability of defendant's service.   See also

5    Henley v. Dillard Dep't Stores, 46 F. Supp. 2d 587, 592 (N.D.

6    Tex. 1999) (holding that incidental use defense did not apply

7    where the defendant used the value associated with a well-known

8    musician's name in a "wordplay" in order to attract consumers'

9    attention);  Accordingly, defendant is not entitled to summary

10   judgment on its asserted incidental use defense.

11       Because under the facts before the court the defendant

12   cannot establish as a matter of law that its use of plaintiff's

13   name and identity is protected by the First Amendment or by the

14   incidental use doctrine, defendant's motion for summary judgment

15   on plaintiff's common law and statutory claims of commercial

16   misappropriation is DENIED.

17   **B.    Lanham Act**

18       Plaintiff claims that defendant violated the Lanham Act,

19   specifically 15 U.S.C. § 1125(a), because the appearance of

20   plaintiff's name in the Publication is likely to cause confusion

21   about plaintiff's affiliation or connection to defendant.

22   (Pl.'s Opp'n at 11.)  "Section 43(a) of the Lanham Act, 15

23   U.S.C. § 1125(a), prohibits, *inter alia*, the use of any symbol

24   or device which is likely to deceive consumers as to the

25   association, sponsorship, or approval of goods or services by

26   another person."   Wendt v. Host Int'l, 125 F.3d 806, 812 (9th

27   Cir. 1997).  "An express purpose of the Lanham Act is to protect

28   commercial parties against unfair competition."   Abdul-Jabbar,

19

85 F.3d at 410 (quoting Waits, 978 F.2d at 1108)).  A false

endorsement claim is actionable under the Lanham Act if such

claim is based on the unauthorized use of a uniquely

distinguishing characteristic of a celebrity's identity that is

likely to confuse consumers as to the plaintiff's sponsorship or

approval of the product.  Wendt, 125 F.3d at 812.  "Because the

names and likenesses of celebrities are commonly . . . used in a

wide variety of publications, Lanham Act jurisprudence places

great importance on the likelihood of consumer confusion as the

'determinative issue' in false endorsement claims.  Kournikova

v. General Media Commc'ns., Inc., 278 F. Supp. 2d 1111, 1120

(C.D. Cal. 2003).  The likelihood that a well-known individual's

name or likeness was used to promote a product with which he has

no association raises the possibility of commercial injury.  Id.

Defendant contends that plaintiff's claim fails as a matter

of law because (1) plaintiff must and cannot demonstrate triable

issues of fact regarding actual confusion because the

Publication does not contain any express endorsement; and (2)

the nominative fair use doctrine supports summary judgment.[9]

(Def.'s Mem. at 13, 15.)

**1.    Likelihood Of Confusion**

"In cases involving confusion over endorsement by a

celebrity plaintiff, 'mark' means the celebrity's persona."

---

[9]    Defendant also argues that the Lanham Act claim fails
because plaintiff, as a public figure featured in a
noncommercial speech, bears the burden of proving with clear and
convincing evidence that defendant acted with actual malice.
However, for reasons mentioned *supra*, the court does not
characterize the Publication as noncommercial speech and,
accordingly, need not reach the issue of actual malice.

1  <u>White</u>, 971 F.2d at 1400.  In such cases, the Ninth Circuit has

2  utilized the eight-factor test set forth in <u>AMF, Inc. v.</u>

3  <u>Sleekcraft Boats</u>, 599 F.2d 341 (9th Cir. 1979), to determine

4  whether there is a likelihood of confusion regarding endorsement

5  arising out of a defendant's use of a plaintiff's mark.

6  <u>Downing</u>, 265 F.3d at 1007; <u>Abdul-Jabbar</u>, 85 F.3d at 413; <u>White</u>,

7  971 F.2d at 1400.  These factors include:

8      (1)  strength of the plaintiff's mark;
       (2)  relatedness of the goods;
9      (3)  similarity of the marks;
       (4)  evidence of actual confusion;
10     (5)  marketing channels used;
       (6)  likely degree of purchaser care;
11     (7)  defendant's intent in selecting the mark; and
       (8)  likelihood of expansion of the product lines.

12

13  <u>White</u>, 971 F.2d at 1400.  These factors "are not necessarily of

14  equal importance, nor do they necessarily apply to every case."

15  <u>Downing</u>, 265 F.3d at 1008.  Further, because "[t]he Lanham Act's

16  'likelihood of confusion' standard is predominantly factual in

17  nature . . . [s]ummary judgment is inappropriate when a jury

18  could reasonably conclude that most of the factors weigh in a

19  plaintiff's favor."  <u>Wendt</u>, 125 F.3d at 812.

20      In this case, plaintiff has presented sufficient evidence

21  regarding likelihood of confusion to withstand summary judgment.

22  Both plaintiff and defendant agree that Yeager is a public

23  figure publicly associated with his accomplishment in breaking

24  the sound barrier.  (<u>See</u> Pl.'s Opp'n at 4; Def.'s Mem. at 12.)

25  As such, his "mark" is strong.  Further, there is no dispute

26  that defendant used plaintiff's mark in its Publication, which

27  was directed at creating positive associations with its

28  services.  A jury could infer that under these facts,

21

1  defendant's intent was to capitalize upon the positive

2  associations with plaintiff's name by implying endorsement in

3  order to achieve its objectives.  While there is little

4  relationship between plaintiff's mark and the cellular services

5  in emergency situations and scant specific evidence regarding

6  actual confusion, the court cannot find that defendant is

7  entitled to judgment as a matter of law at this stage in the

8  litigation.[10]

9      **2.   Nominative Fair Use**

10     Nominative fair use is a specific defense to claims under

11 the Lanham Act applied to "a class of cases where the use of the

12 trademark does not attempt to capitalize on consumer confusion

13 or to appropriate the cachet of one product for a different

14 one." New Kids On The Block v. New Am. Publ'g, Inc., 971 F.2d

15 302, 308 (9th Cir. 1992); see Abdul-Jabbar v. Gen. Motors Corp.,

16 85 F.3d 407, 412 (9th Cir. 1996).

17     To establish a nominative fair use defense, a defendant

18 must prove three elements:

19     (1) the product or service in question must be one not
       readily identifiable without use of the trademark;
20
21     (2) only so much of the mark or marks may be used as is
       reasonably necessary to identify the product or
       service; and
22
23     (3) the user must do nothing that would, in conjunction
       with the mark, suggest sponsorship or endorsement by

24

25     [10]   The court notes that neither party fully addresses the
       application of the Sleekcraft factors in their briefs.  Rather,
26     defendant only argues that there has been no evidence of actual
       confusion.  While this factor is important, it is not
27     determinative.  Further, while somewhat vague, Victoria Yeager
       testified that she received phone calls regarding confusion as
28     to whether plaintiff endorsed defendant's services.  (Dep. of
       Victoria Yeager, Ex. H to Stroud Decl., at 134:2-13.)

1    the trademark holder.

2    <u>Downing</u>, 265 F.3d at 994.[11]  The doctrine of nominative fair use

3    applies only when the mark is "the only word reasonably

4    available to describe a particular thing." <u>Abdul-Jabbar</u>, 85

5    F.3d at 412.  "Because it does not implicate the source-

6    identification function that is the purpose of the trademark . .

7    . such use is fair because it does not imply sponsorship or

8    endorsement by the trademark holder." <u>Id.</u>; see <u>Cairns v.</u>

9    <u>Franklin Mint Co.</u>, 292 F.3d 1139, 155 (9th Cir. 2002) (holding

10   that there was no confusion regarding endorsement where the

11   plaintiff's mark was not so closely associated with the

12   plaintiff that any mention would suggest sponsorship or

13   endorsement).

14       Where a celebrity's name is used in a commercial, there are

15   triable issues of fact regarding whether such use implies

16   endorsement.  In <u>Abdul-Jabbar</u>, the defendant car manufacturer

17   used the plaintiff's name in a commercial, comparing the famous

18   basketball player's college basketball record to the defendant's

19   awards for its car.  85 F.3d at 409.  The court noted that by

20   closely analogizing the plaintiff's record of being voted the

21   best player in three consecutive years to the defendant's

22   product being placed on the "best buy" list three years in a

23   row, the defendant "arguably attempted to appropriate the cachet

24   of one product for another, if not also to capitalize on

25   consumer confusion.  <u>Id.</u> at 413 (internal quotations omitted).

26   ───────────────

27       [11]  The parties do not discuss the first two elements of
     this defense, but rather focus their arguments on the third
28   element, the likelihood of consumer confusion regarding
     endorsement because of defendant's conduct.

1  The court held that because the "use of celebrity endorsements
2  in television commercials is so well established by commercial
3  custom," a jury might find an implied endorsement through the
4  defendant's use of the plaintiff's name. Id. ("Many people may
5  assume that when a celebrity's name is used in a television
6  commercial, the celebrity endorses the product advertised.
7  Likelihood of confusion is therefore a question for the jury.").
8  Accordingly, the court held that there was a question of fact as
9  whether the defendant was entitled to the nominative fair use
10  defense. Id.
11    In this case, defendant has failed to meet its burden in
12  establishing that the nominative fair use defense applies as a
13  matter of law. Defendant used plaintiff's name and
14  accomplishments to support its own product, specifically
15  comparing plaintiff's feat in breaking the sound barrier to
16  defendant's technological advancements. While not featured in a
17  television commercial, the deliberate, closely-tied analogy in a
18  press release directed to create positive associations with
19  defendant's product is sufficient to raise a triable issue of
20  fact regarding implied endorsement.[12] Indeed, Victoria Yeager
21  testified that after the press release, she received a few calls
22  inquiring about whether Yeager endorsed AT&T. (Dep. of Victoria
23  Yeager, Ex. H to Stroud Decl., at 134:2-13.) Therefore, on the

24  _____
25    [12]  Furthermore, while defendant argues that its limited
   reference to plaintiff's name and accomplishment is insufficient
26  to imply endorsement, it fails to proffer any evidence regarding
   what type of use would imply endorsement for purposes of
27  comparison. Cf. Cairns, 292 F.3d at 1154-55 (holding that the
   absence of statements regarding authorization that the defendant
28  used in relation to other products supported applicability of
   nominative fair use defense).

24

1   record before the court, defendant is not entitled to summary

2   judgment on its asserted nominative fair use defense.

3        Accordingly, defendant's motion for summary judgment on the

4   Lanham Act claim is DENIED.

5   **C.**   **Plaintiff's Remaining Claims**

6        Finally, defendant contends that plaintiff's claims for

7   violation of California Business and Professions Code § 17200,

8   violation of California False Advertising Act, and unjust

9   enrichment must be dismissed because they are substantially

10   congruent to plaintiff's commercial misappropriation and Lanham

11   Act claims. Because, as set forth above, the court finds

12   defendant's prior arguments unpersuasive, defendant's motion for

13   summary judgment on the remaining state law claims is also

14   DENIED.

15   **CONCLUSION**

16        For the foregoing reasons, defendants' motion for summary

17   judgment is DENIED.

18        IT IS SO ORDERED.

19   DATED: December 7, 2009

20

21                          FRANK C. DAMRELL, JR.
                           UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

Exhibit B

1

2

3

4

5

6

7

8

9

10                    UNITED STATES DISTRICT COURT

11                   EASTERN DISTRICT OF CALIFORNIA

12                         ----oo0oo----

13   GENERAL CHARLES E. "CHUCK"
     YEAGER (RET.),
14
               Plaintiff,
15
          v.                          NO. 2:07-cv-02517 FCD GGH
16
                                      MEMORANDUM AND ORDER
17   CINGULAR WIRELESS LLC;
     BELLSOUTH; SBC COMMUNICATIONS;
18   AMERICAN TELEPHONE & TELEGRAPH;
     and DOES 1 to 200, inclusive,
19
               Defendants.
20
21                         ----oo0oo----

22        This matter comes before the court on defendant AT&T

23   Mobility, LLC's ("AT&T" or "defendant") motion for certification

24   of interlocutory appeal from the court's December 7, 2009 order

25   denying defendant's motion for summary judgment pursuant to 28

26   U.S.C. § 1292.  Plaintiff General Charles E. "Chuck" Yeager

27

28
                                  1

1  ("Yeager" or "plaintiff") opposes the motion.  For the reasons

2  set forth herein,[1] defendant's motion is GRANTED.

3       The general rule is that an appellate court should not

4  review a district court ruling until after entry of a final

5  judgment.  Coopers & Lybrand v. Livesay, 437 U.S. 463, 474

6  (1978); In re Cement Antitrust Litig., 673 F.2d 1020, 1026 (9th

7  Cir. 1982), aff'd sub nom. Arizona v. Ash Grove Cement Co., 459

8  U.S. 1190 (1983); see 28 U.S.C. § 1291.  There is however, an

9  exception to this general rule:

> When a district judge, in making in a civil action an
> order not otherwise appealable under this section,
> shall be of the opinion that such order involves a
> controlling question of law as to which there is
> substantial ground for difference of opinion and that
> an immediate appeal from the order may materially
> advance the ultimate termination of the litigation, he
> shall so state in writing in such order.  The Court of
> Appeals . . . may thereupon . . . permit an appeal . .
> . if application is made to it within ten days . . . .

16  28 U.S.C. § 1292(b).  An interlocutory appeal should be granted

17  "only in exceptional situations in which allowing [such an

18  appeal] would avoid protracted and expensive litigation."  In re

19  Cement Antitrust Litig., 673 F.2d at 1026 (citing U.S. Rubber

20  Co. v. Wright, 359 F.2d 784, 785 (9th Cir. 1966)).  The party

21  seeking certification of an interlocutory appeal has the burden

22  to show the presence of those exceptional circumstances.

23  Coopers & Lybrand, 437 U.S. at 474-75.

24       Section 1292 identifies three factors that must be present

25  in order for the court to certify an appeal.  First, the issue

27       [1]    Because oral argument will not be of material
assistance, the court orders this matter submitted on the
28  briefs.  See E.D. Cal. L.R. 78-230(h).

2

1  to be certified must involve a controlling issue of law.  An

2  issue is "controlling" if "resolution of the issue on appeal

3  could materially affect the outcome of litigation in the

4  district court."  In re Cement Antitrust Litig., 673 F.2d at

5  1026 (citing U.S. Rubber Co. v. Wright, 359 F.2d at 785).

6  Second, there must be substantial ground for difference of

7  opinion on that issue.  A party's strong disagreement with the

8  court's ruling is not sufficient for there to be a "substantial

9  ground for difference"; the proponent of an appeal must make

10  some greater showing.  See First Am. Corp. v. Al-Nahyan, 948 F.

11  Supp. 1107, 1116 (D.D.C. 1996) ("Mere disagreement, even if

12  vehement, with a court's ruling on a motion to dismiss does not

13  establish a 'substantial ground for difference of opinion'

14  sufficient to satisfy the statutory requirements for an

15  interlocutory appeal.").  Third, an interlocutory appeal must be

16  likely to materially speed the termination of the litigation.

17  This factor is linked to whether an issue of law is

18  "controlling" in that the court should consider the effect of a

19  reversal by the court of appeals on the management of the case.

20  See In re Cement Antitrust Litig., 673 F.2d at 1026.

21      This case arises out of the use of plaintiff's name in a

22  publication issued by Cingular Wireless entitled "Cingular

23  Wireless Announces Enhanced Emergency Preparedness Program for

24  2006 Hurricane Season" (the "Publication").[2]  In denying

25  defendant's motion for summary judgment, the court held that the

26  First Amendment defense did not bar plaintiff's claims for

27  ────────────

28      [2]   The facts of this case are set forth in the court's
    Memorandum & Order, filed December 7, 2009.

statutory or common law misappropriation because the publication
constituted commercial speech.  Similarly, the court held that
plaintiff had raised triable issues of fact regarding his claim
under the Lanham Act,, 15 U.S.C. § 1125(a), based, in part, on
the court's conclusion that plaintiff did not need to
demonstrate malice with clear and convincing evidence because
the publication was commercial speech.  The remainder of
plaintiff's claims were derivative of his claims for
misappropriation and violation of the Lanham Act; therefore,
defendant's motion for summary judgment failed for the same
reasons.

The court concludes the certification for interlocutory
appeal is appropriate under the circumstances presented in this
litigation.  Specifically, the court's conclusion regarding the
commercial nature of the publication is a threshold matter in
this case.  First, resolution of the issue on appeal could
materially affect the outcome of litigation because, if the
Ninth Circuit concludes that the publication at is not
commercial speech, the viability of all of plaintiff's claims is
called into question.  Second, there is substantial ground for a
difference of opinion regarding whether the publication was
commercial speech under both Supreme Court and Ninth Circuit
precedent.  While the court considered the publication in this
case analogous to the publications at issue in Bolger v. Youngs
Drug Prods. Corp., 463 U.S. 60 (1983), and Downing v.
Abercrombie & Fitch, 265 F.3d 994 (9th Cir. 2001), there is no
precedential authority directly on point.  Finally, because the
determination of the nature of the speech is a controlling issue

4

1   with respect to defendant's liability, an immediate appeal will

2   material advance the ultimate termination of the litigation.

3        Accordingly, defendant's motion for certification of appeal

4   pursuant 28 U.S.C. § 1292(b) is GRANTED.

5        IT IS SO ORDERED.

6   DATED: March 12, 2010

7   _____

8   FRANK C. DAMRELL, JR.
    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# 10-80074

CIVIL, STAYED

## U.S. District Court
### Eastern District of California - Live System (Sacramento)
### CIVIL DOCKET FOR CASE #: 2:07-cv-02517-FCD-GGH

Yeager v. AT&T Mobility, LLC.
Assigned to: Judge Frank C. Damrell, Jr
Referred to: Magistrate Judge Gregory G. Hollows
Demand: $100,000,000

Date Filed: 11/21/2007
Jury Demand: Both
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Charles E. Yeager**                    represented by    **Charles J. Harder**
Wolf Rifkin Shapiro Schulman &
Rabkin, LLP
11400 West Olympic Boulevard
9th Floor
Los Angeles , CA 90064-1582
(310) 478-4100
Fax: (310) 479-1422
Email: CHarder@wrslawyers.com
*ATTORNEY TO BE NOTICED*

**Robert G. Eliason**
Wild, Carter & Tipton
246 W. Shaw
Fresno , CA 93704
(559) 224-2131
Fax: 559229-7295
Email: bobeli@comcast.net
*TERMINATED: 09/09/2008*

**Steven E. McDonald**
De La Pena & McDonald LLP
785 Market Street
14th Floor
San Francisco , CA 94103
415-227-4100-8215
Fax: 415-227-4116
Email: smcdonald@dlpmcd.com
*TERMINATED: 03/08/2010*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

Case: 10-80074, 03/29/2010, ID: 7279407, DktEntry: 1-3, Page 63 of 65

**Cingular Wireless LLC**
*TERMINATED: 03/28/2008*

represented by **Andrew W Stroud**
Mennemeier Glassman and Stroud
980 Ninth Street
Suite 1700
Sacramento , CA 95814-2737
916-553-4000
Email: stroud@mgslaw.com
*ATTORNEY TO BE NOTICED*

**O. Yale Lewis-PHV , Jr.**
Hendricks and Lewis
901 Fifth Avenue
Suite 4100
Seattle , WA 98164
206-624-1933
Fax: 206-583-2716
Email: oyl@hllaw.com
*ATTORNEY TO BE NOTICED*

**Whitney I. Furman-PHV**
Hendricks and Lewis
901 Fifth Avenue
Suite 4100
Seattle , WA 98164
206-624-1933
Fax: 206-583-2716
Email: wif@hllaw.com

**Defendant**

**Bellsouth**
*TERMINATED: 03/28/2008*

represented by **Andrew W Stroud**
(See above for address)
*ATTORNEY TO BE NOTICED*

**O. Yale Lewis-PHV , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Whitney I. Furman-PHV**
(See above for address)

**Defendant**

**SBC Communications**
*TERMINATED: 03/28/2008*

represented by **Andrew W Stroud**
(See above for address)
*ATTORNEY TO BE NOTICED*

**O. Yale Lewis-PHV , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Whitney I. Furman-PHV**

(See above for address)

**Defendant**

**American Telephone & Telegraph**          represented by   **Andrew W Stroud**
*TERMINATED: 03/28/2008*                                      (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **O. Yale Lewis-PHV , Jr.**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Whitney I. Furman-PHV**
                                                             (See above for address)

**Defendant**

**AT&T Mobility, LLC**                      represented by   **Andrew W Stroud**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **O. Yale Lewis-PHV , Jr.**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Stephen Lau**
                                                             Mennemeier, Glassman & Stroud LLP
                                                             980 9th Street, Suite 1700
                                                             Sacramento , CA 95814
                                                             (916) 551-2597
                                                             Email: slau@mgslaw.com
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Whitney I. Furman-PHV**
                                                             (See above for address)

| Date Filed | # | Docket Text |
|---|---|---|
| 11/21/2007 | 1 | COMPLAINT against all defendants by Charles E. Yeager. Attorney Eliason, Robert G. added. (Attachments: # 1 Civil Cover Sheet)(Eliason, Robert) (Entered: 11/21/2007) |
| 11/26/2007 | | RECEIPT number 2871 for civil filing fee of $350.00 by Robert G. Eliason fbo of Charles Yeager. (Plummer, M) (Entered: 11/26/2007) |
| 11/26/2007 | 3 | SUMMONS ISSUED as to *Cingular Wireless LLC, Bellsouth, SBC Communications, American Telephone & Telegraph* with answer to complaint due within *20* days. Attorney *Robert G. Eliason* *Wild, Carter & Tipton* *246 W. Shaw* *Fresno - California - 93704*. (Plummer, M) (Entered: 11/26/2007) |
| 11/26/2007 | 4 | CIVIL NEW CASE DOCUMENTS ISSUED; (Attachments: # 1 Consent |

# hp LaserJet 4345mfp series



## Fax Call Report

1

U.S. Court of Appeals
415-355-8502
Mar-26-2010 07:25 AM

| Job | Date/Time | Type | Identification | Duration | Pages | Result |
|---|---|---|---|---|---|---|
| 12184 | Mar-26-2010 07:24 AM | Receive | 202 693 5774 | 0:55 | 3 | Success |

Mar-26-10   07:55am   From-SASCL Division                              202-693-5774      T-907   P.001/003   F-728



**U.S. Department of Labor**        Office of the Solicitor
Washington, D.C. 20210

FAX

Date:        March 26, 2010

To:          Ninth Circuit Court of Appeals
             ATTN: Brad Ybarreta

Fax:         415-355-8502

From:        Rachel Goldberg
             Attorney
             U.S. Department of Labor

Phone:       202-693-5556

Total Pages: 3

Subject:     *In re Hilda L. Solis, Secretary of Labor, United States Department of
             Labor v. United States District Court, Western District of Washington,*
             Case No. 10-70928

Attached are two pages correcting errors in the Table of Authorities in the Secretary of
Labor's Petition for a Writ of Mandamus filed on March 25, 2010. The attached pages
(pages ii and iii of the Table of Authorities) correct errors in the page numbers listed for
several of the cases and delete two cases that were erroneously included twice. Please
substitute these two corrected pages for the pages in the petition filed on March 25.

Thank you for your assistance,

*Rachel Co...*

Rachel Goldberg

cc:          Patrick M. Madden (via Federal Express overnight delivery)
             Kara A. Larsen (via Federal Express overnight delivery)
             The Honorable Benjamin H. Settle (via Federal Express overnight delivery)